# DUFF *v.* LATSHAW.

PATENTS; INTERFERENCE; ORIGINALITY; PRESUMPTIONS; CONCEPTION AND REDUCTION TO PRACTICE.

1. The burden of proof is upon the junior party to an interference, and his own testimony is not sufficient to establish conception and disclosure.

2. Where the question in an interference is one of originality, and it appears that a model illustrating the invention of the issue was made by workmen under the directions of the senior party, the superintendent of a factory established with the means of the junior party, the junior party must overcome the presumption in favor of the senior party, by showing that the latter was merely carrying out instructions previously given to him.

3. Where, in an interference involving the invention of an improvement in pulleys, the question was one of originality, a decision of the Commissioner of Patents was *reversed*, and priority awarded the senior party, although all of the tribunals of the Patent Office concurred in the award of priority to the junior party, where it appeared, among other things, that, while the junior party was a manufacturer of experience, he had no particular knowledge of pulley construction, while the senior party was a mechanic and former inventor of pulleys; that the senior party had previously made a pulley with solid arms, which was one of the features of the invention in issue, although it did not contain all of its elements; that a factory for the manufacture of pulleys had been established with money furnished by the junior party, of which the senior party was superintendent; that the model of the pulley in question was made at the factory under the supervision of the senior party; that the junior party caused a third party to file an application for a patent for the invention, which application, upon its being put in interference with that of the senior party, was abandoned, and the explanation of the junior party as to why such application was filed was that he was ignorant of the law and supposed that the mechanic who constructed the device was the one entitled to the patent for his invention; and that the other facts reviewed tended to support the claim of the senior party that the pulley was made in the factory in question prior to the date of conception alleged by the junior party.

No. 475. Patent Appeals. Submitted March 17, 1908. Decided April 14, 1908.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.        *Reversed.*

The facts are stated in the opinion.

*Mr. Clarence P. Byrnes* and *Messrs. Bakewell & Byrnes* for the appellant.

*Messrs. Kay, Totten, & Winter* and *Mr. Frederick W. Winter* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority of invention of an improvement in pulleys described in the following issue:

"1. A sectional metal pulley comprising rim sections provided with spoke receiving holes countersunk on the outer faces, angle ears riveted on the inner faces at the ends of said rim sections, means for connecting together the angle ears of adjacent rim sections, hub sections formed of wrought metal having body portions semitubular in shape and provided with spoke-receiving holes extending therethrough radially to the axis of the pulley and being countersunk on the inner face, said hub sections having at their edges radially projecting portions provided with bolt-receiving holes, and spokes having straight end portions provided with square shoulders and tenons, said shoulder bearing against the inner face of the rim and outer face of the hub sections and tenons being inserted in the spoke holes of the rim and hub and upset therein.

"2. A sectional metal pulley comprising rim sections provided with spoke-receiving holes countersunk on the outer face, hub sections, each being an integral solid member provided with spoke holes extending therethrough radially to the axis of the pulley and having flat seats surrounding said holes and radially projecting ears, bolts connecting said radially project-

ing ears, spokes having straight end portions provided with square shoulders and tenons, the shoulders bearing against the inner face of the rim, and against the seats of the hub, and the tenons extending through the holes in the rim and hub and being upset therein."

The invention is a split pulley, in which the hub and the rim are each made in two parts and bolted together. The essential feature consists in using solid arms or spokes having square shoulders and straight tenons at their ends, which enter countersinks formed at the outer face of the rim and the inner face of the hub, and are riveted therein.

The first application for this invention was filed by Joseph A. Kaplan June 30, 1905. This application was filed at the suggestion of William H. Latshaw (the appellee), who had an assignment from Kaplan.

John T. Duff (the appellant) filed July 11, 1905, and the interference was first declared between him and Kaplan. The latter failed to prosecute his claim and dropped out of the proceeding.

William H. Latshaw filed on March 9, 1906.

Duff alleged conception in 1894, disclosure in September, 1894, and in 1895, and reduction to practice in February, 1905.

Latshaw alleged conception December 1, 1904, disclosure same day, drawings March 29, 1905, model constructed March 5, 1905, and reduction to practice April 1, 1905.

The question at issue between the parties is one of originality.

Duff was a mechanic and the holder of several inventions relating to pulleys and other devices. McNaugher was his friend, who had advanced money to Duff for making and patenting inventions, and had an interest in the same. Latshaw was a man of capital, who had been connected with various manufacturing enterprises. He was familiar with the business of manufacturing and selling pipes and tubes.

In June, 1904, Latshaw, joined by Rhodes, another capitalist, entered into a contract with Duff and McNaugher, by

the terms of which the former were to furnish necessary funds
to undertake the manufacture of pulleys and belts covered by
patents owned by the latter; and if, after construction and
test, the inventions were found satisfactory, a corporation was
to be organized for manufacture and sale. Forty per cent
of the capital stock was to be given Duff and McNaugher as
payment for the patents which were to be assigned to the
corporation. Latshaw and Rhodes thereafter purchased the
buildings and plant of the Bradley Company, then about to
suspend business. Duff was made superintendent of the work,
mechanics were employed and experiments begun. McNaugher
had a desk in the office, but seems not to have been specially
employed. It was soon discovered that the threaded arm pulley
of Duff was not a commercial success. The threaded ends
inserted in rim and hub had a tendency to become loose, and
were thought insufficient to bear the strain. Two kinds of
pipe-arm construction were tried, during the summer, fall, and
winter of 1904. The first of these had arms made of sections
of tubes extended from hub to rim, and were united thereto,
respectively, by short rivets extending through holes for the
purpose. The ends of the rivets projected into the ends of
the tubular arms. They were first secured by shrinking. This
was found impracticable, and the tubular end was next se-
cured to the rivet by a cross rivet passing through both. This
was not deemed commercial, and a long rivet was substituted
for the two short ones. This long rivet passed through the tube
from hub to rim, and was secured in each. Some forty or
fifty pulleys were built after this plan. Some preparations
were made for building the solid arm pulley, but, before they
were completed, the relations between Duff and Latshaw be-
came strained, and, about the middle of March, 1905, Duff
was discharged. The plant was closed for a few days, but
opened up before April 1, 1905, with Kaplan as foreman or
superintendent of construction. Thereafter, the solid-arm pul-
ley was manufactured for commercial use. For a time, a
beaded rim described in Duff's patent was used in this con-
struction, but it was abandoned for a differently made rim.

After doing this, on May 23, 1905, Latshaw addressed a letter to Duff and McNaugher as follows:

Pittsburgh, Pa., May 23d, 1905.

Dear Sirs:—

This is to notify you, in pursuance of the articles of agreement between us, dated June 9, 1904, that the result of the demonstration, provided for in the articles of agreement mentioned, of the utility of patents mentioned and referred to in said agreement, has proved unsatisfactory to us, and we hereby express our desire and willingness to reassign to you all of the interest in the said patents and applications for patents referred to in the said agreement now held by us, and to discontinue and disclaim any interest that we or either of us might or could claim in said patents or application for patents, and do hereby now determine and declare that the contract above mentioned, and all the provisions therein, shall from this date be null and void and not binding upon any of the parties thereto, as provided therein.

Yours very truly,
Joshua Rhodes,
Wm. H. Latshaw.

McNaugher ceased to visit the premises thereafter.

Latshaw claims that, the tube-arm constructions proving unsatisfactory, he conceived the invention of the issue on December 1, 1904, and caused it to be construed by Kaplan on or about April 1, 1905.

Duff claims to have conceived the invention long before this, and to have urged its construction upon Latshaw as early as September, 1904; but that the latter opposed it on the ground of greater expense. Before or after December 1, 1904, a model was made in the factory under the direction of Duff. This consisted of a solid steel bar with tenons and shoulders riveted at each end into pieces representing, respectively, sections of hub and rim. It fully illustrates the invention of the issue. The question of originality turned chiefly upon the

date of the construction of this model. If made, as alleged by Duff, in September, 1904, then he is entitled to the award of the invention, as Latshaw does not claim to have had the idea before December 1, 1904.

Duff's testimony to the construction of this model in September, 1904 was corroborated by McNaugher, his son Hugh Duff, and by Cowen, Ley, and Heron, who were mechanics working in the factory. The Examiner of Interferences, after a review of the evidence, was of the opinion that these witnesses were mistaken as to the date of this construction, and awarded priority to Latshaw. The Examiners-in-Chief affirmed this decision, but stated that they were "somewhat at a loss as to how this case should be decided." The Commissioner concluded his review of the testimony by saying that the witnesses might have been mistaken as to the time when the model was made, and added: "However, on the whole, the evidence, so far considered, seems to be in favor of Duff." In common with the others, he laid great stress upon certain circumstances in the case and upon certain conduct of Duff, and concluded to reject the evidence of the certain date of the construction of the model as testified to by Duff and his witnesses. This conclusion was based largely upon certain time cards of the factory showing work by Cowen and the long riveted tube arms late in November and early in December, 1904.

Notwithstanding the great weight that is always given to the concurring decisions of the Patent Office tribunals on questions of fact, we are constrained, after a careful consideration of all the facts and circumstances in evidence, to differ with them.

We think that sufficient weight has not been given to some of the evidence tending to show that Duff had a conception of the invention of the issue, not derived from Latshaw, and that the model illustrating it had been constructed as early as September, 1904. As before observed, it was not without doubt that the Examiners-in-Chief and the Commissioner rejected the sufficiency of that evidence. There were also certain well-established facts and circumstances in the case, to some of which

great weight was given, while others received little or no consideration.

It is to be borne in mind that the burden of proof was upon Latshaw as the junior party, and that, in respect of the facts of conception and disclosure of the invention, his own testimony is not sufficient for the purpose. Again, as the model illustrating the invention was undoubtedly made by workmen under the instructions of Duff, and not of Latshaw, the latter had to overcome the presumption arising therefrom in favor of Duff, by showing that Duff was merely carrying out instructions previously given to him.

Among the circumstances before alluded to as entitled to some weight in determining the contested claim of invention, are these: Latshaw, though a manufacturer of experience, had no practical knowledge of pulley construction, and was not a practical mechanic, and had not invented anything before; while Duff was both a mechanic and a former inventor of pulleys. Duff's evidence tended to show that a solid-arm pulley model produced by him in evidence had been constructed by him in the year 1895. The Commissioner found this to be true, and that this model contained the essential features of the invention of the issue. There seems to be no reason to doubt the soundness of this conclusion. But Duff had laid this model away, and had made no previous attempt to introduce it into commercial use or to patent it. He evidently passed it by in favor of his screwed-arm construction, and the pipe arms which he had interested Latshaw in. The Commissioner rightly held that this model was not a reduction to practice, and nothing more than an abandoned experiment, which was unavailing as against a later independent conception of Latshaw.

The importance of this earlier construction as a circumstance supporting Duff's claim to the revival of the conception in September, 1904, as claimed by him, was, however, overlooked.

Having conceived the solid-arm pulley in 1895, and embodied that conception in a model, it is within the range of reasonable probability that the idea may have recurred to him

after the failure of later conceptions, especially when, under the arrangement with Latshaw and Rhodes, he had a considerable pecuniary interest in devising a successful pulley. It was more natural, therefore, that the disappointment of his expectations in regard to his other construction should have brought back to his recollection this former invention, than that it should have occurred to Latshaw as an entirely original conception of his own.

Passing by the evidence of Duff, his son Hugh, and McNaugher to the construction of the solid-arm exhibit September, 1904, we have the testimony of three mechanics to the same effect. Cowen, apparently a skilful mechanic and a fair and disinterested witness, testified that in September, 1904, he, under Duff's directions, made the model, with which Duff said he wanted to demonstrate the idea to Latshaw. He said, also, that Duff told him that he had formerly made a pulley with solid arms. He had no memorandum by which to fix the date of this construction, but was positive that it was made in September, 1904. He said, also, that, about a week later, Latshaw and Duff talked of the solid-arm pulley in his presence in the shop, and that Latshaw said he could purchase the tubing cheaper than the solid stock for the arms. In January, 1905, he turned out six solid arms for a pulley under the direction of Duff, and saw Hugh Duff rivet them in a pulley. The works closed on March 18, 1905, and witness left. Ley and Heron, two subordinate mechanics, testified to the construction of the model in September, 1904, and to the making of a solid-arm pulley before Duff was turned away. Ley also said that, after Kaplan took charge as superintendent or foreman about the last of March, 1905, he explained to Kaplan how the pulley was assembled.

The dates given by these witnesses were rejected as mistaken, on the strength of certain time cards showing that work had been done on sample long rivets for tube arms late in November, 1904, and on the evidence that work on long rivets preceded the construction of the model. There were no time cards in September showing work on these long rivets. Those time

cards showed general tool work. During August, September, and October, no pulleys were made for market, but the work, was in putting machinery in order, experimenting, and making tools. The witnesses testified that it was customary to enter general tool work on the time cards, unless there was a job of some special nature requiring some length of time. They stated that a long-rivet pulley had been constructed, about that time, and that its construction for trade was at last contemplated. That the time cards of November, 1904, were for work done on sample rivets which were to be sent to several manufacturers to go by in filling orders therefor.

Latshaw's own testimony as to the conception of the solid-arm pulley on December 1, 1904, and the construction of the model thereafter, has some support in these time cards as to the date which he claims. But he has no other witness to his conception and disclosure at that time.

Mrs. Hite, his stenographer and confidential clerk, testified that Latshaw talked of the solid-arm construction the latter part of November, or first part of December, 1904, when he paid bills for the long rivets that had been ordered. She also said that she had heard arguments and discussions between Latshaw and Duff in which Duff objected to the solid arms because of the additional weight. He wanted the pipe arm and Latshaw the solid arm. In her cross-examination she stated that she had heard these discussions "along in September or October." Instead of sustaining Latshaw, this evidence tends to corroborate Duff's witnesses as to the earlier date of the construction of the model, although it shows that Duff was opposed to its use because of its additional weight. The important fact is that she heard these discussions in September or October, 1904, at which time, according to Latshaw, the invention had not been thought of by him.

Another witness for Latshaw was one Hough. This witness was a traveling salesman for pulley manufacturers, now selling for Latshaw. He fixed his dates of visits to Latshaw's works by means of a diary. His first visit was November 9, 1904; his second, March 14, 1905. On this first visit Latshaw asked

his opinion about the pipe-arm construction, and Duff's knowledge of the pulley business. On the second visit, Latshaw asked him what he thought of a pulley built with a solid arm, and witness gave it his approval, when Latshaw described it. On May 27, 1905, he saw a solid-arm pulley constructed in accordance with the description. This date of disclosure to Hough, March 15, 1905, adds no weight of consequence to Latshaw's claim of earlier conception, as it was long after the construction of the model and the turning out of a lot of solid arms for the construction of a pulley, and but a day or two before Duff's discharge and the temporary close of the works. The cross-examination of Hough developed the fact that there was shown him on his first visit, November 9, 1904, a finished pulley having the pipe arms with long rivets. This supports the statements of Cowen and others in regard to the construction of such a pulley before the date that the time cards showed work on the long-rivet samples. The witness did not know, of course, when the pulley was actually constructed, but he saw it in the shop at least ten days before the issue of the time cards on which such reliance has been placed. He was not mistaken as to the date because he kept a memorandum showing where he was each day. The work on this pulley must therefore have gone on the time cards of earlier date under the head of general work, as testified to by Cowen.

There is another circumstance in the case, apparently ignored by the tribunals of the office, which we think tends strongly to discredit the claim of Latshaw to the invention. The first application for patent for the invention was filed by John A. Kaplan on June 20, 1905. This was done at the suggestion of Latshaw, and through his patent solicitors, and for his benefit, as he took an assignment from Kaplan at the same time. This action, utterly opposed to his own claim of invention, he undertook to explain by saying that he was ignorant of the law and supposed that the mechanic who constructed the device was the one entitled to the patent for its invention. It may be true that he labored under this erroneous impression, but the statement is an improbable one under all the circumstances.

Latshaw was a shrewd man of business who had been connected with manufactures for years, and must have known the important part that patent rights played therein. He knew that Kaplan had done nothing but assemble the parts of a device that had been completely planned with the intention to manufacture and put upon the market. He thoroughly appreciated the importance of securing the patent, and took the precaution of procuring Kaplan's assignment of it. Kaplan must have known better, as he stated that he had before taken out one or more patents. It seems strange, moreover, that all the facts were not communicated to the solicitors who were called on to propose the application, and remained undisclosed until the interference was declared with the application of Duff filed eleven days later.

On the whole, we think that Latshaw has not only failed to overcome the burden imposed upon him, but also that the facts and circumstances in evidence sustain the claim of Duff.

The decision will therefore be reversed. It is so ordered, and the clerk will certify this decision to the Commissioner of Patents as required by law. *Reversed.*